729 A.2d 1088

COMMONWEALTH of Pennsylvania, Appellee,

v.

Mark David BREAKIRON, Appellant.

Supreme Court of Pennsylvania.

Submitted July 20, 1998.

Decided April 9, 1999.

---

.520

Phyllis A. Jin, Uniontown, Michael J. Savona, Brownsville, for M. Breakiron.

Robert A. Graci, Marianne E. Kreisher, Harrisburg, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## OPINION

NEWMAN, Justice.

In this capital case, Mark David Breakiron ("Breakiron") appeals from an order denying post-conviction relief.

## I. FACTS

On March 24, 1987, Breakiron stabbed Saundra Marie Martin (Ms. Martin) at Shenanigan's Lounge, the bar at which she was working. He then took her purse and the bags that contained the bar's cash receipts for the day. He threw Ms. Martin's body in his pick up truck and hid it in the woods near his grandparents' house, where the police discovered the body the next day. At the time the body was discovered, it was nude except for a sock on her foot. The pathology reports indicated that Ms. Martin had been stabbed twenty times and her neck was slashed. She had defensive wounds on her hands and signs of blunt force trauma to her head.

At trial, Breakiron's sole defense to the crime was "diminished capacity." The only witness was Breakiron, who testified that because of his alcohol intoxication on the evening of the murder, he did not remember the incident, but that he recalled portions, ". . . like a TV screen inside [his] head and [he] saw someone laying there getting stabbed." (N.T. at 1256) In addition, Breakiron testified that he went to the bar where Ms. Martin was working and had a number of beers, after already drinking about fourteen beers, and shots of liquor. At about 12:30 a.m. all of the other patrons had left the bar except Breakiron. Ms. Martin came around the bar,

and sat on a barstool near him. They talked for awhile and then Breakiron went to a pinball machine at the back of the bar. Ms. Martin came over to him and he tried to put his arm around her. "The next thing" he recalls is "getting hit over the head with something heavy." (N.T. at 1253) He fell to the floor and remembers nothing else. When he regained consciousness, Ms. Martin was on the floor of the bar with a knife in her back. Breakiron proceeded to pull the knife out of her back, hurry out of the bar, and get in his truck. (N.T. at 1255) He tried to get out of there because "everything was wrong." *Id.* As he was driving, he felt that he was "part of it" and that "he had to correct it." *Id.* He returned to the lounge, went to the body, felt that it was cold, picked her up, carried her outside and put her in the bed of the truck. At that time, he took bags of money, which contained the receipts of the bar for the evening and he took Ms. Martin's purse.

Ellis Price, a prison mate of Breakiron's, testified that Breakiron told him that when Breakiron got to the bar, another man and woman were there, so he went into the bathroom to hide until they left. Breakiron asked for another drink, and the barmaid said it was closing time, and he had to leave. He then picked up an ashtray and started hitting Ms. Martin. When she would not "go to the floor," he pulled out a knife. Then he dragged her to his truck and took her to his "Pap's" house where he "finished her off."

Following the presentation of evidence, a jury convicted Breakiron of first-degree murder and robbery. At a hearing on April 14, 1998, the jury sentenced Breakiron to death, finding two aggravating circumstances: that Ms. Martin was tortured, and that the murder was committed in the course of a robbery. No mitigating circumstances were found. We affirmed the judgment of sentence on March 14, 1990. *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035 (1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990) (*Breakiron I* ).[1] Trial counsel represented Breakiron

---

**1.** In *Breakiron I*, we rejected the arguments that pre-trial publicity was prejudicial, and that the warrants for the search of Breakiron's home, person, and truck were improper. We determined that the trial court

through the direct appeal and during a petition for certiorari to the United States Supreme Court.

On March 11, 1996, Breakiron filed a pro se petition pursuant to the Post–Conviction Relief Act (PCRA), alleging claims of ineffective assistance of counsel and trial court error and requesting appointment of counsel. The main thrust of the pro se petition was that trial counsel was ineffective in handling certain mental health issues. The Court of Common Pleas of Fayette County (PCRA court) appointed new counsel to represent Breakiron during the PCRA proceedings, and appointed the Attorney General's office to handle the prosecution because of a conflict within the District Attorney's office. PCRA counsel filed an amended PCRA petition, on which the PCRA court held hearings on July 17 and 18, 1997 and September 17 and 19, 1997. The PCRA court denied relief, holding that Breakiron's claims were either waived, previously litigated or were without merit. This appeal followed.

## II. ANALYSIS

In this appeal, Breakiron seeks review of the denial of relief, by the PCRA court, on a number of grounds. First, he argues that the PCRA court should have recused the Attorney General from prosecuting the PCRA issues because the Attorney General's office improperly enlisted the aid of the Fayette County District Attorney's office, which had previously been

did not "chill" his right to an insanity defense by providing copies of the report to the prosecution, that the evidence supported the determination that the killing was committed by means of torture and that the evidence supported a finding that the killing occurred "in the course of a robbery." We also rejected Breakiron's argument that there was insufficient evidence to support a first-degree murder charge. The jury had sufficient evidence to reject Breakiron's defense that the killing was a third degree murder because he had a diminished capacity due to his alcohol consumption on the night of the murder. Also, as is relevant to this appeal, we performed a proportionality review and determined that the death penalty was not a product of passion, prejudice, or any arbitrary factor. Justices Zappala and Nix dissented because they believed that the handling of the mental health issues and competency hearing was prejudicial error. They also particularly noted that counsel's handling of the mental health issue constituted ineffective assistance of counsel.

recused from prosecuting the PCRA petition. Additionally, Breakiron raises two issues regarding both his conviction for first degree murder and the imposition of the death penalty. We first address Breakiron's arguments that the PCRA court should have recused the Attorney General from involvement in this matter. We will then discuss the issues related to alleged error in the guilt and penalty phases of the trial.

## A. RECUSAL OF THE ATTORNEY GENERAL

Because of an alleged conflict of the Attorney General's office, Breakiron requests that we remand this matter for a new PCRA hearing. We disagree that the Attorney General's office had any actual conflict in this matter.

During the PCRA proceedings, Breakiron requested that the PCRA court appoint special counsel from the Attorney General's office because in the interim from Breakiron's trial to the PCRA filing, both of Breakiron's trial and direct appeals counsel, Richard Bower and Jack Heneks of the Public Defender's office, became Assistant District Attorneys. Consequently, the Fayette County District Attorney's office had a conflict of interest in prosecuting the matter before the PCRA court. (The Fayette County District Attorney's office consisted of only five attorneys, including the two who had worked on *Breakiron I*.) The trial court granted the request to recuse the District Attorney. (Apparently, the District Attorney's office agreed that a conflict existed and requested that the Attorney General's office take over the matter.) Following this motion and Order of the PCRA court, Chief Deputy Attorney General Robert Graci assumed the prosecution of the PCRA claims pursuant to 71 P.S. § 732-205.

A short while after the appointment of Attorney Graci, Breakiron filed a motion to recuse Attorney Graci and to appoint another special prosecutor. The basis for the motion was that Attorney Graci allegedly created a conflict of interest because he asked trial counsel Bower to review a file that was still in the Public Defender's office. In addition, Attorney Graci had also requested Attorney Bower to review PCRA filings before the pleadings were filed with the court. On

January 23, 1997, the PCRA court held a hearing regarding Breakiron's motion for recusal of the Attorney General. On March 10, 1997, the PCRA court denied the motion, holding that it:

> [found] no conflict to warrant recusal of the Attorney General. We must note initially that our decision should not be construed as our condonation or approval of the actions taken by Attorney Graci in soliciting Attorney Bower's assistance, or Attorney Bower's review of the file in the public defender's office... Our research has revealed no case on point. Nevertheless, we find that the effect is de minimis at this early stage of the proceedings... Any alleged conflict is not so severe as to warrant the drastic measures of recusing the Attorney General and appointing a special prosecutor.

■ We agree with the trial court that while the Attorney General's actions in this matter are not to be condoned, removal of the Attorney General was not an appropriate remedy, and the effect, if any, on the PCRA proceeding was de minimis. Breakiron did not meet his burden of showing that there was any actual impropriety in Attorney Graci's conduct. *See, e.g., Commonwealth v. Harris,* 501 Pa. 178, 460 A.2d 747 (1983) (in order to appoint special prosecutor in PCHA proceedings, the defendant must show an actual impropriety, which taints the proceedings). We deny Breakiron's request that we remand this matter for another PCRA hearing.[2]

## B. *INEFFECTIVE ASSISTANCE OF COUNSEL*

Breakiron next raises a number of arguments attacking the effectiveness of his trial counsel, which were properly raised to the PCRA court because that was his first opportunity to bring such a challenge. *Commonwealth v. Seachrist,* 478 Pa. 621, 623, 387 A.2d 661, 663 (1978). These claims can be

---

2. We find the cases cited by Breakiron, *Commonwealth v. Eskridge,* 529 Pa. 387, 604 A.2d 700 (1992) and *Commonwealth v. Miller,* 281 Pa.Super. 392, 399, 422 A.2d 525, 529 (1980), inapposite because, unlike here, they dealt with situations of actual conflict arising during the trial.

categorized as follows: (1) those that relate to counsel's trial preparation; (2) those that relate to jury selection; (3) those that relate to the court's jury instructions during the guilt phase of trial; (4) those that relate to the aggravating circumstance of torture; (5) those that relate to counsel's remarks during closing argument in the penalty phase; (6) counsel's presentation of mitigating circumstances, (7) counsel's presentation of Breakiron's alcohol abuse; and (8) trial counsel's handling of mental health issues in both the guilt and penalty phase of trial. We address each of these below.[3]

### 1. COUNSEL'S TRIAL PREPARATION

It is Breakiron's contention that counsel failed to interview and consult with him adequately, claiming that he and counsel met only two or three times before trial. However, Attorney Bower testified at the PCRA hearing that he had numerous telephone calls with Breakiron and met with him on a number of occasions before trial. The PCRA court found counsel's statements credible and denied the claim. We find no reason to reverse that decision. The length of time that trial counsel spends with defendant does not, by itself, imply the extent of trial counsel's preparation for trial. *Commonwealth v. Bundy*, 491 Pa. 607, 421 A.2d 1050, 1051 (1980). This claim does not have arguable merit and the PCRA court appropriately rejected it.

### 2. JURY SELECTION

During general voir dire regarding a jury panel's knowledge of the case, the following interaction took place:

The Court: All right. Anybody else that we missed?

**3.** Breakiron also argues that the database we used to assess Petitioner's sentence in *Breakiron I* was flawed, inaccurate and incomplete. Breakiron then requests us to revisit the proportionality review, citing, *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (Pa.1997). It does not appear that Breakiron has raised sufficient information to indicate that the figures used in 1990 were invalid. This argument lacks merit, was previously litigated in *Breakiron I*, and we will not revisit this issue here.

Juror No. 67: I know about it from reading it in the papers and I know some of the family.

The Court: Whose Family?

Juror 67: Breakirons.

The Court: All Right.

**Juror 67: I know the boy. I lived in the terrace and he used to do a lot of robbing there.**

The Court: From what you know of the family and what you may have learned, do you have a fixed opinion about this case that could not be changed no matter what you hear in this room?

Juror 67: Yes.

The Court: In other words, you could not judge the case impartially, is that what you are telling us?

Juror 67: Right.

The Court: You could not be a fair juror, possibly?

Juror 67: Right.

The Court: We are going to excuse you sir. You are now excused.

(N.T. at 440–41, 448) (emphasis added).

One of the other veniremen in this panel, Juror 114, eventually sat on the jury. At the time of the statement, trial counsel did not object, did not make any motion to strike the panel, nor did he request that the trial court question the remaining jurors as to whether they had heard the statement. (N.T. at 448–49) After dismissing Juror 67, the court immediately began another general question about whether any member of the jury panel was acquainted with the parties, or the attorneys, in the case.

After the general voir dire by the court, the defense and prosecution individually questioned the jurors. During individual questioning of Juror No. 114, defense counsel asked him about his positive response to hearing about the incident, and whether he had spoken to anyone about the case. Juror 114 responded that he had not spoken to anyone other than

his wife. Defense counsel also specifically asked Juror 114 the following:

> Q: Have you heard anyone in your presence talk about this case other than your wife?
>
> A: No.
>
> Q: As a result of what you have talked with your wife, have you formed an opinion as to the guilt or innocence of Mr. Breakiron?
>
> A: No.

(N.T. at 511–512). Juror No. 114 was then questioned as to whether he could be a fair an impartial juror and he indicated that he could. *Id.* He was selected as an acceptable juror by both the defense and prosecution.

■ Breakiron argues that he is entitled to a new trial because trial counsel did not move to strike the jury panel or request a mistrial after the panel heard prejudicial statements of Breakiron's alleged criminal past. He would be entitled to a new trial only if he could establish that his claim has arguable merit, that trial counsel lacked a reasonable strategy for not striking this panel or requesting a mistrial, and that the trial counsel's error prejudiced him. *See generally Commonwealth v. Collins,* 546 Pa. 616, 619, 687 A.2d 1112, 1113 (1996); *Commonwealth v. Pierce,* 537 Pa. 514, 525, 645 A.2d 189, 195 (1994).

■ Under these circumstances, a motion to strike the jury panel may have been an appropriate course of action. *See, e.g., Commonwealth v. Harkins,* 459 Pa. 196, 328 A.2d 156 (1974).[4] Nonetheless, trial counsel is not ineffective for failing to do so. At the PCRA hearing, trial counsel testified that he did not make a motion to strike or move for a mistrial because

4. In *Harkins,* the defendant was convicted of prison breach. During jury selection, one of the prospective jurors, in the presence of other prospective jurors said aloud, "I don't think I should sit on this case." When the trial court asked whether the juror had some contact with the case, the juror replied, "Yes, he stole my car." The trial court denied a motion to strike the jury panel, but the juror who made the statement was excused. The Superior Court affirmed, but we reversed because other jurors, who eventually sat on the jury, heard evidence of a previously committed crime.

the seated juror had stated that he could render an unbiased opinion, and consequently there was no basis to strike the panel or move for a mistrial. (PCRA N.T., 7/17/97, at 76–77). The PCRA court found that this was a plausible trial tactic, and therefore Breakiron failed to meet his burden that counsel's actions were not reasonably based.

After reviewing the jury voir dire of the juror in question (N.T. at 512–521), we agree with the PCRA court, and find that trial counsel had a reasonable basis for his actions. The juror stated that he could be a fair and unbiased juror, and that no one spoke of the case in his presence. The PCRA court did not err in denying Breakiron's petition. *See, e.g., Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997);[5] *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).[6]

### 3. *JURY INSTRUCTION REGARDING THEFT*

■ The next claim of ineffectiveness is that counsel, during the guilt phase of the trial, did not request a jury instruction as to theft. The argument is that if the jury was given the option, they might have found Breakiron guilty of theft but not robbery. Without the robbery conviction, the prosecution could not use it as an aggravating factor during the sentencing. We find that even if this argument had merit and that trial counsel could have requested a theft and a robbery jury charge, Breakiron cannot establish that he was prejudiced.

**5.** In *Gibson,* we held that the trial court did not err in refusing to dismiss the entire jury panel after one of the veniremen stated, within hearing of other potential jurors, that he knew one of the victims and that drugs were involved in the crime. We so held because the appellant failed to demonstrate that any of the seated jurors actually had been exposed to the comment in question.

**6.** In *Martin,* we held that the trial court did not err in refusing to strike a jury panel where a juror in the panel made comments to other potential jurors in the case. The Appellant failed to show any prejudice that the seated jury could not render a fair and unbiased opinion.

The charge of the trial court instructed the jury not to return a guilty verdict of robbery without first finding that a theft had occurred. (N.T. at 1352–54) Moreover, trial counsel argued to the jury during closing argument that there could be no robbery, but solely a theft because Breakiron took money only after Ms. Martin was dead. (N.T. at 1312, 1320–21) The jury rejected this argument and convicted Breakiron of robbery. In *Breakiron I,* we held that the evidence supported this verdict because there was no question that Breakiron took the victim's purse and the bags of money from the bar. *Breakiron I,* 524 Pa. at 296–97, 571 A.2d at 1042. Had a theft instruction been given, it is not likely that the jury would have returned a verdict only on the theft charge. Moreover, the jury found an additional aggravating circumstance—torture—and no mitigating factors. Thus, Breakiron cannot show that the claimed error prejudiced him.

### 4. *COUNSEL'S REMARKS AT PENALTY PHASE*

■ Breakiron claims that trial counsel erred in his handling of the robbery issue because during the penalty phase, trial counsel stated that the prosecution had shown that the "murder took place in commission of robbery." This statement, Breakiron argues, was ineffective assistance of counsel because counsel conceded an aggravating factor during the sentencing, where robbery itself may not have had an aggravating impact on the commission of the crime. Trial counsel testified at the PCRA hearing that the admission was a reasonable strategy because the jury already found Breakiron guilty of robbery and counsel would lose credibility with the jury to argue otherwise. We agree that trial counsel articulated a reasonable trial strategy and Breakiron has not met his burden of proof to establish that counsel was ineffective.

### 5. *TORTURE*

A number of Breakiron's challenges to counsel's representation of him relate to the handling of the aggravating circumstance of torture. First, he claims that PCRA relief was warranted because his trial counsel failed properly to perform

pre-trial investigation and research regarding the aggravating factor of torture. He goes on to argue that the prosecution's main evidence of torture was that Ms. Martin suffered defensive wounds, that she lived for about fifteen minutes after suffering extensive stab wounds, and that Breakiron took Ms. Martin from the lounge to his grandparents home where he completed the murder. Further, Breakiron asserts that prudent defense counsel should have investigated the timing of how long it took to drive back and forth from the lounge to the home, to show that Ms. Martin must have been dead at the lounge, as testified to by Breakiron, and not at the home, as the prosecution postulated.

The PCRA court denied the Petition on this claim, holding that this issue was already litigated in the direct appeal, and Breakiron was improperly attempting to relitigate the issue of whether the evidence supported the aggravating circumstance of torture. We agree. Also, Breakiron's claim is flawed and without merit because a thorough review of the trial transcript reveals that the use of torture as an aggravating circumstance arose out of the multiple stab wounds and other injuries inflicted on Ms. Martin, not necessarily the time that it took her to die. Whether trial counsel investigated the amount of time it took to drive from the lounge to Breakiron's grandparents home is irrelevant to the factual basis for the evidence of torture. This claim is without merit, and has been previously litigated. Accordingly, the PCRA court properly denied the Petition on these grounds.

Next, Breakiron maintains that to the extent that torture as an aggravating factor is defined in the death penalty statute as a murder committed in an "especially heinous, atrocious, or cruel manner," it is unconstitutionally vague under the holding of the Supreme Court in *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This argument was waived, as it was not raised in the direct appeal. Pursuant to *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 699 (1998), we no longer apply a relaxed waiver in PCRA cases. However, because this claim has been

raised also in terms of trial counsel's ineffectiveness, it is within the examination of this Court. *Id.,* 720 A.2d at 700.

Breakiron claims that counsel was ineffective because counsel failed to raise the issue of the vagueness of the definition of torture contained within the death penalty statute. We hold that this argument is without merit because we have previously held that the death penalty at 42 Pa.C.S. § 9711(d)(8) is not unconstitutionally vague. *Commonwealth v. Wharton,* 530 Pa. 127, 153, 607 A.2d 710, 723 (1992).

In a related argument, Breakiron posits that the jury charge regarding torture was vague and violated *Maynard, supra.* We apply the same analysis as above and examine this claim in terms of trial counsel's ineffectiveness. The trial court charged the jury in the following manner:

The law defines torture as follows: the offense of murder committed by means of torture is designed for the defendant who causes a considerable amount of pain and that the language used for this particular aggravating circumstance is that the murder was especially heinous, atrocious, or cruel and manifesting exceptional depravity. In order to establish that the offense was committed by means of torture, the Commonwealth must prove beyond a reasonable doubt that a defendant had a specific intent to inflict unnecessary pain, suffering or both pain and suffering in addition to the specific intention to kill.

(N.T. at 1439). This claim lacks merit as we have upheld similar instructions to the jury in *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078 (1993) and *Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699 (1989). Moreover, Breakiron's suggested interpretation of *Maynard* is incorrect. *Maynard* held that a jury instruction that defined an aggravating circumstance only as a murder that was "especially heinous, atrocious or cruel," without any additional limiting construction was unconstitutionally vague. However, such language was not constitutionally deficient if limited to circumstances of torture or serious physical abuse, as was done in this case. *Maynard* 486 U.S. at 364–65, 108 S.Ct. 1853. The torture

instruction given in this case was not vague under the *Maynard* analysis, and Breakiron's claim lacks merit.

Last, Breakiron argues that trial counsel was ineffective for failing to challenge, in the direct appeal, the unconstitutionality and inadequacy of the torture charge. The PCRA court rejected these claims of ineffectiveness because at the PCRA hearing, no evidence was produced as to why counsel did not raise the issue, which prevented the PCRA court from finding whether counsel's actions were reasonably based. Therefore, the PCRA court denied relief finding that Breakiron failed to meet his burden. We agree. Additionally, the jury charge for torture was not in error, as discussed, *supra*, and Breakiron's claim lacks merit.

## 6. *JURY CHARGE AS TO MITIGATING CIRCUMSTANCES*

Breakiron claims that he is entitled to a new death penalty hearing because the trial court improperly instructed the jury regarding mitigating circumstances. Again, under *Albrecht*, we analyze this argument as one for ineffective assistance of counsel.

During Breakiron's trial, the trial court instructed the jury, with respect to the finding of aggravating and mitigating factors, that a "verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances; or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment." (N.T. at 1443).

Relying on *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), Breakiron argues that this instruction was in error because the jury may well have concluded that it must be unanimous regarding a mitigating circumstance. He claims that both trial and appellate counsel were ineffective for failing to object and raise this argument on direct appeal. The PCRA court determined that the issue was waived because it was not addressed in the direct appeal. In addition,

the PCRA court held that Breakiron had not sustained his burden of proof regarding the claims of ineffectiveness because, during the PCRA proceedings, trial counsel was not questioned as to the strategy employed in failing to object to the court's charge on mitigation. Consequently, the PCRA court did not have a record to determine the issue, and rejected the claim. We agree. Further, Breakiron's claims lack merit because we have previously held that instructions quite similar to those used by the trial court in this matter do not violate *Mills*. *See, e.g., Commonwealth v. Hardcastle,* 549 Pa. 450, 701 A.2d 541 (1997); *Commonwealth v. Frey,* 520 Pa. 338, 554 A.2d 27 (1989).[7]

## 7. *ALCOHOL HISTORY*

Breakiron next argues that trial counsel was ineffective in both the guilt and penalty phases of the trial for failing to present a complete picture of his alcohol abuse history. Although counsel presented evidence of Breakiron's alcohol intake on the night of the murder, he did not present it in context to his long history of alcohol abuse and mental health problems and in context to the fact that Breakiron had an extended period of abstinence from alcohol and drugs (Breakiron had been incarcerated for some 11½ months and had been released from prison a few weeks before the murder, on March 12, 1987, for indecent assault.) According to this line of argument, trial counsel was ineffective for failing to present the effect that drinking a large quantity of alcohol would have on Breakiron under these circumstances and in combination with his personality disorder.

7. Note, however, that the Third Circuit vacated defendant's sentence in *Frey v. Fulcomer,* 132 F.3d 916 (1997)(Becker, J.), *cert. denied,* —— U.S. ——, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998). The Third Circuit found that an essentially similar jury instruction to the one at issue here improperly limited the jury's consideration of mitigating circumstances. We reached a contrary result in *Commonwealth v. Frey,* 520 Pa. 338, 348, 554 A.2d 27, 31 (1989), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990) and we are not bound to accept the Third Circuit's interpretation of this issue. *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31 (1998) (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 130 n. 15, 661 A.2d 352, 366 (1995))

■ This claim lacks merit and Breakiron was not prejudiced.[8] Trial counsel presented evidence at trial that Breakiron drank a large quantity of beer and was intoxicated on the night of the murder. Counsel argued that this intoxication was such that Breakiron could not form a specific intent to kill. The jury also heard testimony that Breakiron drove, drank, and could function, even though he had consumed excessive amounts of alcohol. After hearing this evidence, the jury rejected Breakiron's defense of diminished capacity and sentenced him to death. There is not a reasonable likelihood that the evidence that Breakiron had refrained from alcohol for nearly a year before the incident would have changed the jury's verdict in this matter, and the PCRA court appropriately denied relief.

## 8. MENTAL HEALTH ISSUES

The bulk of Breakiron's claims that counsel was ineffective focus on counsel's handling of Breakiron's mental health issues. The facts relevant to this claim are as follows. On March 27, 1987, following the murder of Ms. Martin, Breakiron was in jail for public drunkenness and parole violations unrelated to Ms. Martin's death. There was some concern that he was suicidal and Dr. Thomas Adamski of the Fayette County Department of Mental Health (Fayette County) performed a psychiatric examination. Dr. Adamski determined that Breakiron was not in need of psychiatric treatment.[9] On April 3, 1987, following Dr. Adamski's initial examination,

---

**8.** In *Breakiron I,* we discussed the evidence of intoxication. *Id.* 571 A.2d at 41, 42.

**9.** Dr. Adamski's report, dated March 27, 1987 (March report) indicates that Breakiron's medical history is significant for heavy alcohol use "producing a deep alcoholic sleep," and for problems with drugs. The March report notes that Breakiron "admits to having blackouts and tolerance with alcohol." There was discussion of Breakiron's previous arrest history, with a notation that a "lot of his arrests stem from alcohol and intoxication, including demonstration of poor judgment, impulsivity and explosiveness." Breakiron was noted to have a past psychiatric history significant for being seen by a psychiatrist when he was 13 years old, difficulty controlling his temper, and for attempted suicide when he was 8 or 9 years old. The report indicated that Breakiron had two prior psychiatric admissions for "detox" in 1985 and for "evaluation" in 1984. The March report diagnosed Breakiron

Breakiron was formally charged with the murder of Ms. Martin. The record indicates that following the formal charge, on May 21, 1987, Breakiron's first attorney with the Public Defender's office, Attorney Kristobak, filed a Petition seeking that the "Court direct that defendant be transported for an evaluation and recommendation for a period of ninety (90) days and that said reports be furnished the Public Defender immediately upon completion." On May 4, 1987, the court entered an order that the "Fayette County Mental Health is hereby directed to evaluate the defendant herein, to determine whether defendant is competent to stand trial and assist counsel with his defense, to determine if defendant was competent at the time of the incident, and to determine whether defendant is in need of treatment."

Thereafter, Dr. Adamski, the same psychiatrist from Fayette County who had previously seen Breakiron, performed another interview. Dr. Adamski wrote a report, dated August 27, 1987, (August report) and made specific reference to his March report concerning Breakiron. In the August report, Dr. Adamski concluded that Breakiron was "competent to stand trial and assist counsel with his defense" and "competent at the time of the incident." During the course of Dr. Adamski's second interview in preparation for the August 1987 report, it appears that Dr. Adamski told Breakiron that any statements that he made at that time could be used at trial against Breakiron. As a result of these warnings, Breakiron claims that he did not fully cooperate with the evaluation. On February 26, 1988, Breakiron's third public defender, Attorney Bower, petitioned for a second court-ordered psychiatric examination. Specifically, counsel asked that the "Court direct that defendant be transported for an evaluation and recommendation for a period of sixty (60) days and that said reports be furnished the Public Defender immediately upon completion." The trial court then entered an Order for a second psychiatric evaluation with the Fayette County facility. During this second examination, Breakiron apparently was told again that his statements could be used at trial, he did not

as alcohol dependent with "antisocial personality disorder." However, he was not suicidal and did not need treatment at that time.

cooperate, and the examination did not go forward. (Breakiron claims that counsel told him not to cooperate, counsel denies this assertion.) No counsel or independent psychiatrist was present. Trial counsel did not request a competency or sanity hearing before trial.

According to Breakiron, counsel was ineffective because he failed to follow the Mental Health Procedures Act (MHPA), 50 P.S. 7101 *et seq*, and because he failed to properly present his psychiatric history to the jury as a mitigating factor.

### a. *The Mental Health Procedures Act*

In relevant part to this matter, the MHPA provides a statutory procedure for assessing a defendant's competency to stand trial. Section 7402(c) provides that the prosecution, the defense, or a warden may present to the court an application for an order directing an evaluation for the competency of a criminal defendant. Following the examination, the court appoints a psychiatrist, who then prepares a report and submits it to "the court and to counsel." Section 7402(e). The MHPA contains specific rules concerning the conduct of the mental health examination, and provides the parameters for when it is to be used in a court proceeding. *Id.* In particular, the MHPA provides that the defendant is entitled to have counsel present and that "[n]othing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition." Section 7402(e)(3). The MHPA also provides that the defendant is entitled to the appointment of his own private psychiatrist to attend the examination, if the defendant has a "substantial objection" to the conclusions reached by the court-appointed psychiatrist. Section 7402(f).

Breakiron asserts that counsel failed to employ the MHPA properly in that the court-appointed psychiatrist, Dr. Adamski, improperly conducted the examination and essentially gave him "Miranda" warnings during the August 1987 interview that were not in accordance with the MHPA. He then argues that, pursuant to the MHPA, he had some expectation of confidentiality, that he had a right to have trial counsel

present, and that he had a right to a defense expert psychiatrist following his objection to Dr. Adamski's conduct. These errors, Breakiron asserts, prejudiced him because the effect was to deprive him of the opportunity to have a private psychiatrist testify as to his mental health and psychiatric history during both the guilt and sentencing phase of the trial.

In reviewing the record in this matter, it appears that trial counsel did mishandle the competency evaluation in a number of respects. No counsel was present and following objection to Dr. Adamski's "Miranda" warnings, trial counsel did not request a private defense expert to be present at a second court ordered examination. Further, in reviewing the PCRA testimony of this matter, trial counsel was not able to articulate a reasonable basis for failing to comply with the MHPA. Thus, our determination in this matter hinges upon whether these errors were prejudicial to the defendant at either the guilt or the sentencing phase of the trial. We hold that they were not.

Although Breakiron presents a persuasive argument that trial counsel had a basic misunderstanding of the MHPA, he is unable to articulate how he was prejudiced. Breakiron postulates that had an evaluation been performed in accordance with Section 7402, counsel may have chosen a different trial strategy. He surmises that trial counsel's failure to follow the MHPA left the attorney without any psychiatric evidence to assist in Breakiron's defense or to present mitigating evidence at trial. We find that Breakiron has not met his burden of establishing that counsel's errors prejudiced him because he cannot establish that had an examination been done according to the MHPA, the defense strategy, or the outcome of either the guilty verdict or sentence of death, would have changed. Instead, the PCRA proceedings show that Breakiron was competent at the time of trial,[10] and there was no evidence that trial counsel could have presented an insanity defense. Therefore, the *only* defense available to trial counsel was of diminished capacity, which was presented and rejected by the

10. Dr. Adamski determined in his August 1987 report that based on his observations of Breakiron in March, as well as his conversations with

jury at trial.[11] Thus, the alleged errors, had they been corrected, would not have led to a different result, and we cannot find that Breakiron was prejudiced in the guilt phase of the trial.

Likewise, while trial counsel in this matter might have mishandled Breakiron's mental health examination by not attending and by not requesting a private expert following the objections to Dr. Adamski, the outcome of the sentencing was not likely to have changed. The fact remains that the evaluation was ordered to assess Breakiron's competency to stand trial, and there is no real dispute that Breakiron was competent. Indeed, at the PCRA hearing, both Dr. Adamski and Breakiron's private psychiatrist testified, and neither opined that Breakiron was incompetent at the time of trial. We fail to see how trial counsel's alleged errors, where Breakiron was clearly competent to stand trial, had any bearing on the penalty phase of the trial.

■ The MHPA provides for a private defense expert to attend the competency examination, but does not give Breaki-

friends and family, Breakiron was competent. Additionally, in preparation for the PCRA proceeding, Dr. Adamski reviewed the trial transcript of Breakiron's description of the crime, and opined that it did not change his opinion. He testified that had he been called to testify, as of the time of Breakiron's trial, that he would opine that Breakiron was competent and sane at the time. Appellant presented no contrary evidence.

11. Trial counsel argued that Breakiron could not form a specific intent to kill because of his diminished capacity due to alcohol and his lack of memory of the event. Trial counsel presented evidence at trial that Breakiron was drinking on the night of the murder and he did not remember the incident. Counsel argued that Breakiron had a diminished capacity due to this alcohol intake. The jury rejected this defense and a review of the trial transcript in this matter shows that the evidence of Breakiron's guilt was overwhelming. Four witnesses, including Breakiron himself, testified that Appellant was the last person in the bar with Ms. Martin. Traces of blood matching her type were found on his truck and on his boots. Moreover, Breakiron testified at trial that he recalls Ms. Martin being "stabbed," and that he pulled the knife from her back. He then admitted to dragging her body from the bar, and taking it to his grandparents to dispose of the body. Breakiron admits that he took the money from the bar. Breakiron's testimony did not suggest that he was so intoxicated that he could not walk, drive, and dispose of a body.

ron a right to a private psychiatrist during the penalty phase to present evidence of mitigating circumstances. *See, e.g., Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877, 887 (1995); *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988). Breakiron has failed to establish that his counsel's mishandling of his competency examination prejudiced him, and we reject his claim and affirm the determination of PCRA's court.

### b. *Admission of Psychiatric History*

 Breakiron argues that he was prejudiced in the penalty phase of his trial because counsel did not present, as mitigating circumstances, any evidence of his past psychiatric problems during the penalty phase of his trial, including his history of black outs, drug abuse and psychiatric treatment. He alleges that he was prejudiced because had counsel properly used the MHPA, as discussed *supra,* he would have had the benefit of the private psychiatrist to testify as to these issues.[12] We reject Breakiron's claim because it appears that trial counsel had a reasonable trial tactic in failing to admit evidence of Breakiron's psychiatric history into the trial.

**12.** Breakiron asserts that he was prejudiced and in support presented at the PCRA hearing the expert psychiatric testimony of Dr. Christine Martone. Dr. Martone testified that Breakiron suffered from mental health problems and had alcohol and drug problems. She testified that he was institutionalized on a number of occasions for alcohol and aggression against his mother and sister four years before the murder, and that he had a history of explosive violent behavior when drinking, and suffered black out spells. Specifically, she testified that he was highly intoxicated at time of the incident and blacked out. She discussed the effects of the alcohol with his particular mental health problems, and opined that Breakiron could have this black out and it would still be consistent with an ability to maintain motor control. She testified that Breakiron had a limited ability to control frustration and anger, and had personality disorders, which would cause him to fly into a rage, which drinking exacerbates. She recounted the available medical reports from Dr. Adamski, and his other psychiatric reports, which indicated that he had a long psychiatric history, drug and alcohol problems.

> Dr. Martone testified that:
> In my opinion, this individual, given his past history and his tendency towards an explosive disorder, with the amount of alcohol and drugs he ingested, his frustration tolerance, his judgment, and his impulse

■ At the sentencing hearing, trial counsel presented mitigating evidence concerning Breakiron's alcohol abuse, via the testimony of Breakiron's mother, and through Reverend Collins. Trial counsel testified that his decision to present only these witnesses and to omit any of Breakiron's past psychiatric admissions was a reasonable trial tactic because such history would show his past violence and aggressiveness, which would have an adverse impact on the jury. The PCRA court, citing *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 51 (1997), found that counsel's tactics were reasonable given the potential negative impact on the jury. We should scrupulously follow the presumption that attorneys act in the interests of their clients, and insist that defendants meet their burden of proving that their attorneys had no reasonable basis for their action. *See, e.g., Commonwealth v. Watson*, 523 Pa. 51, 65, 565 A.2d 132, 139 (1989). Here, Breakiron has not done this and we affirm the order of the PCRA court denying relief.

## III. *CONCLUSION*

For the reasons set forth in this Opinion, we affirm the determination denying the petition for post-conviction collateral relief.

Justices CAPPY and SAYLOR concur in the result.

Justice ZAPPALA files a dissenting opinion.

ZAPPALA, Justice, dissenting.

When the Appellant's judgment of sentence came before this Court on direct appeal, *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035 (1990) (*Breakiron I*), Mr. Chief Justice Nix authored a Dissenting Opinion, which I joined, in which he

control, would all be diminished to the extent that there would be, within a reasonable degree of medical certainty, mitigating circumstances in terms of his state of mind at the time of the crime. (PCRA N.T. 9/17.97, a.m. at 41–42) Dr. Martone based her opinion on the report of Dr. Adamski, Breakiron's medical records, and an interview with Breakiron.

concluded based solely on the existing record that trial counsel "was blatantly remiss" in his handling of issues regarding the Appellant's mental status and evaluation under the Mental Health Act. He characterized it as "a grievous failure to provide effective representation in a capital case." *Id.* 571 A.2d at 1046. Because the question of ineffective assistance of counsel had not been raised by the parties, however, it was not specifically addressed in the Opinion of the Court.

A challenge to counsel's stewardship has now been squarely presented in the context of the Appellant's petition under the Post–Conviction Relief Act. The majority concedes "it appears that trial counsel did mishandle the competency evaluation in a number of respects," and in his testimony at the PCRA hearing "trial counsel was not able to articulate a reasonable basis for failing to comply with the [Act]." Opinion at 1099. Nevertheless, the majority determines that these errors were not prejudicial at either the guilt or the sentencing phase of the trial. Because I continue to believe that "we cannot say with certainty that appellant was competent to stand trial or that an insanity defense was inappropriate," *Breakiron I,* 571 A.2d at 1046, (Nix, C.J., dissenting), I respectfully dissent.