**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-9003
_____

MARK BREAKIRON,
Appellant

v.

Commissioner MARTIN HORN; Pennsylvania Department
of Corrections; CONNER BLAINE, Superintendent of the
State Correctional Institution at Greene; JOSEPH
MAZURKIEWICZ, Superintendent of the
State Correctional Institution at Rockview

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 00-cv-00300)
District Judge:  Honorable Nora B. Fischer

_____

Argued:  November 16, 2010

Before:  AMBRO, FUENTES and
NYGAARD, Circuit Judges

(Opinion filed April 18, 2011)

Stuart B. Lev, Esq.
Claudia Van Wyk, Esq. (Argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106

Counsel for Appellant

James P. Barker, Esq. (Argued)
Office of the Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square
16th Floor
Harrisburg, PA 17120

Counsel for Appellees

_____

## OPINION OF THE COURT
_____

NYGAARD, <u>Circuit Judge</u>

A Pennsylvania jury found Mark Breakiron guilty of first-degree murder and robbery for killing a bartender and stealing her purse and money bags from the bar. At the penalty phase, the jury found as an aggravating factor that he committed the murder "while in the perpetration of a felony"—i.e., the robbery. 42 Pa. Cons. Stat. § 9711(d)(6).

The trial court sentenced him to death. On Breakiron's petition for a writ of habeas corpus, the District Court invalidated the murder conviction (and thus the death sentence) because it found that the prosecution withheld material evidence regarding one of its witnesses in violation of the rule set forth in Brady v. Maryland, 373 U.S. 83 (1963). The District Court concluded, however, that the Brady evidence was not material to Breakiron's robbery conviction and did not disturb it.

The Commonwealth[1] has not appealed the District Court's ruling and states that it is prepared to retry Breakiron for murder. Breakiron appeals the denial of relief from his robbery conviction, which, if invalidated, would no longer constitute an aggravating factor during any future penalty phase. Breakiron argues that the Brady violations found by the District Court require the invalidation of his robbery conviction as well, and he raises four other claims addressed to that conviction. We agree with Breakiron on the Brady claim and conclude that three of his other claims also warrant relief. Accordingly, we will reverse the District Court's judgment to the extent that it denied Breakiron's habeas petition as to his robbery conviction and remand for the District Court to grant his petition as to that conviction.[2]

I. Background

---

[1] For ease of reference, we refer to appellees collectively as "the Commonwealth."

[2] Nothing said herein, however, would preclude retrying him on this charge as well.

3

Because Breakiron's murder conviction no longer is at issue, we need only briefly summarize the background relevant to the issues we address. On March 24, 1987, Breakiron killed Saundra Marie Martin, the bartender of a bar called "Shenanigan's" in Uniontown, Pennsylvania, at which he was the night's last patron. He also stole her purse and bags of money from the bar. The Commonwealth charged him with murder and robbery and tried him before a Fayette County jury in April 1988. As explained in more detail below, that jury included a member who had been exposed to testimony by another panel member at voir dire that Breakiron "used to do a lot of robbing[.]" (N.T. 448; A.717.)[3]

At trial, Breakiron never denied killing Martin or committing theft by stealing the money. Instead, he put on a voluntary intoxication/diminished capacity defense and argued that he was guilty of third-degree murder because he did not have the specific intent to kill. He also argued that he was guilty of theft, but not robbery, because he decided to steal after his attack on Martin was complete. See 18 Pa. Cons. Stat. § 3701(a)(1) (defining robbery as, inter alia, infliction of injury or use of force "in the course of committing a theft").

The only evidence potentially relevant to that issue was the testimony of the Commonwealth's witness Ellis Price, who was incarcerated with Breakiron before Breakiron's trial, and Breakiron's own testimony. Price testified that, while imprisoned with Breakiron, he and

---

[3] Citations to the record are to the state trial court record and the appendix on appeal, respectively.

Breakiron had "conversations regarding the offenses with which [Breakiron] has been charged," and that Breakiron made "statements . . . regarding whether or not he participated in these crimes." (N.T. 1112; A.1410.)  Price testified that Breakiron "told me that when he was at the bar, that there was another guy and girl there.  So, he went into the bathroom to hide until they left."  (N.T. 1114; A.1412.)  According to Price, Breakiron told him that he then returned to the bar area and asked for another drink.  (Id.)  Martin, however, told him that it was closing time and asked him to leave, "so he picked up the ashtray and started hitting her."  (Id.)  Price further testified that Breakiron said "[h]e hit her a few times.  She wouldn't go to the floor.  So, he just—he pulled out the knife and I don't know what he did after that.  Then, he drug her out to his truck and took her to . . . his pap's house" and "finished her off there."  (N.T. 1114-15; A.1412-13.)

Breakiron, by contrast, testified that Martin started the altercation by hitting him over the head with "something heavy" after he put his arm around her.  (N.T. 1253; A.1551.)  He further testified that he "blacked out," awoke to find Martin with a knife sticking out of her back, left the bar and drove away.  (N.T. 1254-55; A.1552-53.)  He then returned to the bar, put Martin's body in his truck, went back into the bar, "[a]nd then when I started to leave, I saw two money bags laying on the floor to the entrance by the dance floor" and "[p]ut them in the back of the truck."  (N.T. 1260-61; A.1558-59.)  At closing, Breakiron's counsel argued that he was not guilty of robbery because he decided to steal the money after killing Martin.  (N.T. 1260-61; A.1558-59.)  Breakiron's counsel, however, did not request a charge on the lesser-included offense of theft, and the trial court did not give one.

5

The jury found Breakiron guilty of first-degree murder and robbery. At the penalty phase, the jury recommended a death sentence after finding as an aggravating factor that he murdered Martin "while in the perpetration of a felony"—i.e., the robbery. 42 Pa. Cons. Stat. § 9711(d)(6). (It found as an additional aggravating factor that he committed the murder "by means of torture.") The trial court sentenced Breakiron to death on the murder conviction plus five to ten years of imprisonment on the robbery conviction. The Pennsylvania Supreme Court affirmed. See Commonwealth v. Breakiron, 571 A.2d 1035 (Pa. 1990). Breakiron filed a petition under Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-9546 (the "PCRA") in 1996, and the PCRA court denied it after holding an evidentiary hearing. The Pennsylvania Supreme Court affirmed that ruling as well. See Commonwealth v. Breakiron, 729 A.2d 1088 (Pa. 1999) ("Breakiron-2").

Breakiron then instituted the federal habeas proceeding at issue here in 2000. Shortly thereafter, he filed a second PCRA petition in state court. The PCRA court dismissed it as untimely and the Pennsylvania Supreme Court affirmed. See Commonwealth v. Breakiron, 781 A.2d 94 (Pa. 2001) ("Breakiron-3"). The parties then litigated the federal habeas petition before three different District Judges for almost seven years, during which Breakiron amended his petition several times, took discovery, and received an evidentiary hearing. Breakiron ultimately asserted eighteen claims, including claims addressed to the guilt and penalty phases of his trial and to his murder and robbery convictions. Among them were claims that the prosecution withheld evidence in violation of Brady that he could have used to impeach Ellis Price.

The District Court issued findings of fact on the <u>Brady</u> claims on September 19, 2007. It then issued its opinion and order on September 24, 2008, granting relief on three of those claims and invalidating the murder conviction. The District Court did not find Price's testimony relevant to the robbery charge, however, so it did not grant relief from the robbery conviction on that basis (or any other). The District Court granted Breakiron a certificate of appealability on one claim, but the parties agree that it is moot in light of the invalidation of his murder conviction and he has not pursued the claim on appeal.[4] The Commonwealth moved for reconsideration, which the District Court denied. The Commonwealth has not appealed and asserts that it is prepared to retry Breakiron for murder. Breakiron appealed and filed a motion to expand the certificate of appealability to raise the claims at issue here, which we granted.

## II. Analysis

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). Our review of the District Court's legal conclusions is plenary. <u>See</u> <u>Coombs v. DiGuglielmo</u>, 616 F.3d 255, 260 (3d Cir. 2010). Like the District Court's, our review of Breakiron's claims is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). "AEDPA provides that, where a habeas

---

[4] That claim was that counsel rendered ineffective assistance by failing to present mental health evidence in support of Breakiron's diminished capacity/voluntary intoxication defense at the guilt phase and in support of mitigation at the penalty phase.

7

petitioner's claim was 'adjudicated on the merits' in state court, the petition may not be granted unless the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) (quoting 28 U.S.C. § 2254(d)).

Under AEDPA, a state court decision is "contrary to" established federal law "if the state court reaches a conclusion opposite to the Supreme Court's own conclusion on a question of law or decides the case differently where the Supreme Court was confronted by a set of materially indistinguishable facts." McMullen v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009). A state court decision is an "unreasonable application" of established federal law "if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." Id. This test "'is an objective one—a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly.'" Id. (citation omitted). Instead, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, — U.S. —, No. 09-587, 2011 WL 148587, at * 11 (U.S. Jan. 19, 2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Where the state court has not addressed the merits of a

claim, and the merits of the claim are properly before us, then this deferential standard of review does not apply and we instead review the claim de novo. See Porter v. McCollum, 130 S. Ct. 447, 452 (2009); Wilson v. Beard, 589 F.3d 651, 658 (3d Cir. 2009). In doing so, we nevertheless must presume that state-court factual findings are correct unless the presumption is rebutted by clear and convincing evidence. See Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

In this case, Breakiron argues that: (1) the Brady violations require relief from his robbery conviction; (2) the state trial court improperly precluded him from testifying as to when he formed the intent to steal; (3) trial counsel rendered ineffective assistance by failing to request a jury charge on the lesser-included offense of theft; (4) trial counsel rendered ineffective assistance by failing to take corrective action after a venire member testified at voir dire that Breakiron "used to do a lot of robbing" and a different member of the same panel ended up on Breakiron's jury; and (5) the cumulative effect of these four errors deprived him of a fair trial. We conclude that Breakiron's Brady claims and his two claims of ineffective assistance of counsel, whether considered alone or cumulatively, require relief from his robbery conviction.[5]

---

[5] The District Court addressed Breakiron's claim of cumulative error, but limited its analysis to his claims of ineffective assistance of counsel instead of considering his alleged errors of all kinds. Cf. Albrecht v. Horn, 485 F.3d 103, 138-39 (3d Cir. 2007). Because we conclude that three of Breakiron's claims individually warrant relief, their

9

## A.    The Brady Claims

Breakiron argues that his robbery conviction must be invalidated because the prosecution withheld evidence that he could have used to impeach the testimony of Ellis Price. In his second PCRA petition, Breakiron raised several Brady claims, including a claim that the prosecution failed to disclose that Price had been convicted of an impeachable crimen falsi—i.e., a Michigan state conviction of assault with the intent to rob. The Pennsylvania Supreme Court did not address this claim on the merits because it held that Breakiron's second PCRA petition was untimely. See Breakiron-3, 781 A.2d at 98, 101. Breakiron asserted the same claim in his habeas petition, which he later amended to argue that the prosecution also failed to disclose that Price had sought a deal from Breakiron's prosecutor in exchange for his testimony and was a suspect in an investigation pending when he testified (in which he ultimately was not charged). The Commonwealth argued in the District Court that Breakiron had procedurally defaulted his Brady claims and all the other claims he raised in his second PCRA petition. The District Court rejected that argument by order entered October 15, 2004, and the Commonwealth has not challenged that ruling on appeal.[6]

---

cumulative effect necessarily does as well. In light of our disposition, we need not address Breakiron's second claim.

[6] We nevertheless may consider the issue sua sponte. See Smith v. Horn, 120 F.3d 400, 408 (3d Cir. 1997). In the District Court, the Commonwealth argued that the claims Breakiron raised in his second PCRA petition were

10

Thereafter, Breakiron took discovery on his <u>Brady</u> claims and the District Court held an evidentiary hearing. It ultimately granted relief from the murder conviction under <u>Brady</u> because it concluded that the prosecution failed to disclose that Price: (1) had sought a deal from prosecutors in exchange for his testimony against Breakiron; (2) was a suspect in another criminal investigation pending at that time; and (3) had been convicted of a <u>crimen</u> <u>falsi</u>. The District Court concluded that this evidence was material impeachment evidence because Price's testimony contradicted Breakiron's testimony that he had not intended to kill Martin and was the only direct evidence that Breakiron's attack on Martin was intentional. (Dist. Ct. Op. at 59-61.) The District Court found Price's testimony irrelevant to the robbery charge,

---

procedurally defaulted because the Pennsylvania Supreme Court dismissed it as untimely. The District Court properly rejected that argument because Pennsylvania's former "relaxed waiver" rule in capital cases meant that the PCRA statute of limitations did not constitute an adequate and independent state-law ground for denying the claims at the time of the alleged default. <u>See</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 708-10 (3d Cir. 2005). The Commonwealth also argued that the <u>Brady</u> claims Breakiron had not raised in state court were unexhausted and now procedurally defaulted as well. The District Court agreed, but properly concluded that Breakiron necessarily would show "cause and prejudice" to excuse the default if his underlying claims had merit (i.e., if the prosecution withheld material evidence). <u>See</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) ("cause and prejudice" inquiry parallels elements of substantive <u>Brady</u> claim).

11

however, because Price "did not reference the bar's money bags, Martin's purse, or any statement Breakiron allegedly had made to him regarding the intent to steal or the robbery." (Dist. Ct. Op. at 58 & n.25.)  Thus, it did not grant relief from the robbery conviction.  Breakiron argues on appeal that the prosecution's suppression of evidence requires relief from that conviction as well.[7]

We agree.  A <u>Brady</u> violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was "material."  <u>See</u> <u>Wilson</u>, 589 F.3d at 659 (citing, inter alia, <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).  In

---

[7] The Commonwealth argues that Breakiron waived this issue because he did not meaningfully raise it in the District Court, where he focused instead on the effect of the <u>Brady</u> violations on his murder conviction.  Although the District Court addressed the effect of the <u>Brady</u> evidence on the robbery conviction, neither the District Court nor the parties have cited any document filed in the District Court actually raising that issue.  We nevertheless reach it because the District Court did so and the merits are fully briefed.  <u>See</u> <u>Albrecht</u>, 485 F.3d at 120 (reaching issue that Commonwealth had not raised in the District Court because the District Court addressed it sua sponte and the merits were fully briefed on appeal); <u>see also</u> <u>Silva v. Brown</u>, 416 F.3d 980, 991 (9th Cir. 2005) (considering materiality of <u>Brady</u> evidence to robbery charge, though noting that, "[o]n appeal, [petitioner] understandably focuses on the effect of the undisclosed deal on his murder conviction").

this case, the Commonwealth has not appealed the District Court's rulings that the evidence at issue was favorable to Breakiron or that the prosecution withheld it and does not argue that we can or should review those issues on Breakiron's appeal.[8]  Thus, the only issue on appeal is whether the evidence was material to the robbery charge.  See Simmons, 590 F.3d at 233-34.  We exercise plenary review over that legal issue, see Wilson, 589 F.3d at 657 & n.1, and no deference under AEDPA is due because the state courts did not adjudicate this claim on the merits, see id. at 658.

---

[8] In this regard the prosecutor has much to answer for.  When asked at oral argument why the prosecutor did not disclose this material, the Commonwealth conceded that it "seems a little strange."  The Commonwealth also conceded that such material would have been disclosed "under the modern rules of discovery."  That response is at once true and insufficient.  It was so well-established before Breakiron's trial as to have been axiomatic that prosecutors must disclose impeachment evidence like that at issue here.  See, e.g., United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972).  The Commonwealth has not otherwise attempted to explain why this material was not disclosed or to defend the prosecutor's failure to disclose it.  Like the District Court, we are troubled by that failure.  We are at a loss to understand why prosecutors, so long after Brady became law, still play games with justice and commit constitutional violations by secreting and/or withholding exculpatory evidence from the defense.  What the District Court found, and we declare now, was known and should have been revealed—years ago at the commencement of Breakiron's trial, thus obviating the need for all these protracted years of litigation.

Under Brady, "[e]vidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." Wilson, 589 F.3d at 665 (citing Giglio, 405 U.S. at 154). "'[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)) (internal quotation marks omitted).

The District Court concluded that the prosecution's suppression of impeachment evidence undermines confidence in the murder conviction because Price's testimony supported the prosecution's theory that Breakiron intended to kill Martin. Breakiron argues that Price's testimony also supported the prosecution's theory that he intended to steal at the time he attacked her. The Commonwealth, by contrast, argues that Price's testimony did not support the robbery conviction because he never testified that Breakiron told him anything about the theft.

As an initial matter, the Commonwealth's argument is undercut by the prosecution's own closing argument, in which it expressly argued that Price's testimony supported the robbery charge. The prosecution argued: "The second element, in the cour[se] of committing a theft, ladies and gentlemen. . . . Ellis Price told you that when Mr. Breakiron came back to the bar area that the bartender was counting the

money." (N.T. 1335; A.1633.) When Breakiron's counsel objected that Price had not so testified, the trial court instructed: "The jury will recall the testimony. The Court does not have any recollection of that, but the jury will recall what was testified to by Ellis Price." (N.T. 1335-36; A.1633-34.) Thus, although Price in fact had offered no such testimony, and although the trial court's instruction suggested as much, the Commonwealth's position is at odds with the prosecution's express argument during closing.

We need not decide whether this point is dispositive, however, because we agree with Breakiron that Price's actual testimony supported the robbery charge in three ways.

First, Breakiron argues that Price's testimony suggested that the incident as a whole was a "premeditated and intentional plan," which contradicted his own testimony that he did not intend to steal the money until after he had killed Martin, left, and then returned to the bar. This argument is persuasive. Price opened his testimony by testifying that Breakiron told him about his "offenses with which he has been charged" and his "crimes," plural, which included the robbery charge. Price then testified that Breakiron said he waited in the bathroom until the other patrons left before attacking Martin. This testimony indicates that Breakiron was "lying in wait" and raises an inference that the incident as a whole was premeditated.

The Commonwealth nevertheless argues that Price's testimony was not relevant to the robbery charge because he never mentioned Breakiron's theft of the money. To the contrary, it argues that all of the evidence supporting the robbery charge came from Breakiron himself, who testified

15

that (1) Martin had possession of the money bags and her purse when Breakiron attacked her, and (2) Breakiron later took the money bags from the scene. It further argues that this evidence was sufficient to convict for robbery because the jury could have inferred the requisite intent from acts committed shortly after the killing. See Commonwealth v. Robertson, 463 A.2d 1133, 1136 (Pa. Super. Ct. 1983).

That much is true. As Breakiron argues, however, the Brady materiality standard is not a "sufficiency of the evidence" test, and instead turns on whether the withheld evidence could reasonably "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435 & n.8. Jurors, of course, are entitled to draw all reasonable inferences from the evidence presented, see United States v. Vosburgh, 602 F.3d 512, 537 (3d Cir. 2010); Commonwealth v. Wright, 328 A.2d 514, 516 (Pa. 1974), and the trial court so instructed the jury in this case (N.T. 1344; A.1642). Just as the jury could have inferred that Breakiron intended to steal when he attacked Martin because he later took the money, so too could it have drawn that inference from Price's testimony suggesting that the incident as a whole was premeditated.

Second, Breakiron argues that Price's testimony about Breakiron supposedly "finishing off" Martin after he left the bar supported the conclusion that he stole the money before he killed Martin, and that he thus killed her "in the course of committing a theft" and thereby committed robbery. See 18 Pa. Cons. Stat. § 3701(a)(1)(i). The Commonwealth counters that Breakiron himself testified that he was not sure whether Martin was dead when he returned to the bar, and that she thus might have been alive when he took the money. (N.T.

16

1259-60; A.1557-58.) That argument is beside the point. Although Breakiron frames his argument in terms of when he "killed" Martin, the relevant consideration under the statute is when he used the force that led to her death, not when she actually died. See 18 Pa. Cons. Stat. § 3701(a)(1)(i). Breakiron testified that the assault was over when he returned to the bar and took Martin's body and the money. Price contradicted that testimony by testifying that Breakiron told him he took Martin from the bar and later "finished her off" at his "pap's" house, which would have been after Breakiron took the money and thus "in the course of committing" that theft. See 18 Pa. Cons. Stat. § 3701(a)(2) ("An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission."). Price's testimony was the only evidence that Breakiron committed the theft during the course of an ongoing assault.

Finally, Breakiron argues that Price's testimony undermined his credibility in general because Price's account differed from his own. The Commonwealth has not addressed this argument, and we agree with Breakiron. Price testified that Breakiron told him a different story than Breakiron told the jury. The District Court held that there is a reasonable probability that the jury would have believed Breakiron's account instead of Price's if the defense had been able to impeach Price's credibility with the undisclosed evidence. Even though Price did not testify directly that Breakiron told him anything about the theft, Price's testimony undermined Breakiron's credibility as a whole. With no other direct evidence on when Breakiron formed the intent to take the money, Breakiron's own credibility was crucial. Accordingly, the impeachment evidence that the prosecution

17

withheld was material to the robbery charge and its <u>Brady</u> violations require relief from the robbery conviction.[9]

### B.    Counsel's Failure to Request a Theft Instruction

Breakiron argues that trial counsel rendered ineffective assistance by failing to request a jury instruction on theft, which is a lesser-included offense in the charge of robbery. <u>See</u> 18 Pa. Cons. Stat. § 3701(a)(1); <u>Commonwealth v. Williams</u>, 559 A.2d 25, 27 n.2 (Pa. 1989).  We agree.  At trial, Breakiron testified that he took the money bags only after he left the bar following the assault, returned, put Martin's body in his truck, went back into the bar, and then spotted the bags as he was on his way back out.  (N.T. 1260-61; A.1558-59.)  At closing, his counsel argued that, although Breakiron stole the money bags, he was not guilty of robbery

---

[9] The parties have not cited any cases in which a court has addressed whether <u>Brady</u> evidence was material to some charges but not others.  We have located one case, which is informative by comparison.  In <u>Silva</u>, the Court of Appeals for the Ninth Circuit invalidated a murder conviction because the prosecution withheld evidence that the defense could have used to impeach a witness whose testimony provided the only evidence of the defendant's role in the murder.  <u>See</u> 416 F.3d at 990-91.  The court declined to invalidate the defendant's convictions of robbery and other crimes, however, because "strong evidence in the record" corroborated that witness's testimony regarding the defendant's role in those crimes.  <u>Id.</u> at 991.  In this case, by contrast, there is no direct evidence of record—strong or otherwise—that Breakiron intended to take the money at the time he attacked Martin.

because he decided to take the money only after Martin was dead. (N.T. 1320-21; A.1618-19.) The trial court then instructed the jury that it could find Breakiron guilty of robbery only if it found both that Breakiron committed a theft and that he inflicted serious bodily injury on Martin "in the course of" committing that theft. (N.T. 1352-53; A.1650.)[10]

---

[10] The robbery charge reads in relevant part:

> In order to find the defendant guilty of robbery, you must be satisfied that the following two elements have been proven beyond a reasonable doubt by the Commonwealth. First, that the defendant inflicted serious bodily injury on Saundra Marie Martin. . . . The second element for robbery is that the defendant did so in the course of committing a theft. . . . As I have already indicated, you cannot find the defendant guilty of robbery unless you are satisfied beyond a reasonable doubt that he committed a theft. A person commits a theft if he unlawfully takes the movable property of another person with intent to deprive that person of it permanently. You would need to decide in this case whether the defendant took money and/or a purse which were the movable property of Saundra Marie Martin by inflicting serious bodily injury or the threat of serious bodily injury or the threat oto [sic] commit the crime of murder and that the defendant did these acts in the course of committing the theft. Basically, members of the jury, there are therefore two elements. First, that the theft occurred or that it occurred by infliction of serouus [sic] bodily injury or theft as I have explained it to you.

Breakiron's counsel did not request a further instruction that the jury could find him guilty solely of the lesser-included offense of theft, and the trial court did not give one.

Breakiron claims that his counsel rendered ineffective assistance in that regard. He raised this claim in his first PCRA proceeding. The PCRA court held an evidentiary hearing, at which counsel testified, then rejected the claim on the merits. The Pennsylvania Supreme Court affirmed. See Breakiron-2, 729 A.2d at 1094-95. The District Court deferred to that ruling under AEDPA, but explained that it would deny the claim even under de novo review.

This claim is governed by the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), which constitutes "clearly established Federal law" for AEDPA purposes. Williams v. Taylor, 529 U.S. 362, 391 (2000); Rainey v. Varner, 603 F.3d 189, 197 (3d Cir. 2010). A habeas petitioner asserting a claim under Strickland must establish two elements. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the

_____

(N.T. 1352-53; A.1650-51.) As Breakiron notes, the last sentence of this charge reads "or" where it should read "and," and thus suggests that theft alone is sufficient to convict of robbery. Breakiron has raised no independent claim for relief in this regard on appeal but, as explained below, this suggestion informs our assessment of prejudice.

20

wide range of reasonable professional assistance[.]" Id. at 689. Thus, counsel's performance will be deemed deficient only if it "fell below an objective standard of reasonableness." Id. at 688. The question ultimately is "whether, in light of all the circumstances, the [challenged] acts or omissions were outside the wide range of professionally competent assistance." Id. at 690.

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

### 1.    Counsel's Performance

The Pennsylvania Supreme Court did not address the issue of performance and instead rejected this claim solely on the ground that Breakiron failed to show prejudice. See Breakiron-2, 729 A.2d at 1094-95. The District Court also did not address counsel's performance. Nevertheless, we may do so in the first instance because the record is adequately developed. See Hodge v. United States, 554 F.3d 372, 379 n.9 (3d Cir. 2009). We will review the issue de novo because the state court did not address it. See Porter, 130 S. Ct. at 452.

We conclude that counsel's failure to request a theft

21

instruction was objectively unreasonable. As Breakiron argues, he would have been entitled under Pennsylvania law to an instruction on the lesser-included crime of theft if counsel had requested one because the charge was supported by the evidence. See Commonwealth v. Polimeni, 378 A.2d 1189, 1192 & nn.3-4 (Pa. 1977) (citing, inter alia, Keeble v. United States, 412 U.S. 205, 213 (1973)); see also Beck v. Alabama, 447 U.S. 625, 635-36 & n.12 (1980) (counting Pennsylvania among the states that have "unanimously" so held and citing Commonwealth v. Terrell, 393 A.2d 1117 (Pa. 1978)).[11] The Commonwealth does not argue otherwise.

The Commonwealth also does not defend counsel's performance on this point, and it is apparent from the record that counsel did not have a strategic reason for not requesting a theft instruction. When asked at the PCRA hearing whether he ever considered doing so, he answered merely "I don't believe so." (N.T. PCRA 7/17/97 PM at 70; A.1892.) Thus, the record establishes that counsel's decision not to request a theft instruction was not the kind of strategic choice entitled to deference under Strickland. See Thomas v. Varner, 428 F.3d 491, 499-500 (3d Cir. 2005).

The record also establishes that it was objectively

---

[11] Breakiron argues that instructions on lesser-included offenses that are supported by the evidence are required by the Due Process Clause as well. See Beck, 447 U.S. at 637, 638 n.14; Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988). Because Breakiron has not raised an independent due process claim, and because he would have been entitled to a theft instruction if requested under Pennsylvania law, we need not address that issue.

22

unreasonable. Counsel's sole theory of defense to the robbery charge was that Breakiron had committed a theft but not a robbery. Without a theft instruction, the jury was left with only two choices—conviction of robbery or outright acquittal. In such all-or-nothing situations, "'[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of <u>some</u> offense, the jury is likely to resolve its doubts in favor of conviction.'" <u>Beck</u>, 447 U.S. at 634 (quoting <u>Keeble</u>, 412 U.S. at 212-13). Thus, even though juries are obligated "'as a theoretical matter'" to acquit if they do not find every element of a crime, there is a "'substantial risk that the jury's practice will diverge from theory'" when it is not presented with the option of convicting of a lesser offense instead of acquitting outright. <u>Id.</u> (quoting <u>Keeble</u>, 412 U.S. at 212). By conceding theft but not requesting a theft instruction, Breakiron's counsel exposed him to that "substantial risk," and the record reveals that he had no strategic reason for doing so.

Nor could there have been any. Counsel did not pursue an all-or-nothing strategy at trial by arguing that Breakiron had not committed any crime. Instead, he conceded that Breakiron had committed theft, but neglected to request the theft instruction that not only would have been consistent with that theory of defense but would have given the jury an opportunity to effectuate it. Under the circumstances, no reasonable counsel would have failed to request that instruction. <u>See</u> <u>Richards v. Quarterman</u>, 566 F.3d 553, 569-70 (5th Cir. 2009) (holding that failure to request a lesser-included-offense instruction consistent with theory of the defense "fell below an objective standard of reasonableness"); <u>cf.</u> <u>Lopez v. Thurmer</u>, 594 F.3d 584, 588 (7th Cir. 2010) (holding that decision not to request lesser-

included-offense instruction "appears to have been strategic" where instruction would have been inconsistent with defendant's testimony that he "was innocent of any crime").

## 2.  Prejudice

To show prejudice, Breakiron must establish that there is a reasonable probability that the jury would have convicted him of theft only and not of robbery if counsel had requested the theft instruction to which he was entitled. The Pennsylvania Supreme Court held that Breakiron had not made that showing. Thus, under AEDPA, we may not grant relief on this claim unless that ruling either was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). If we determine that the Pennsylvania Supreme Court's ruling was contrary to or an unreasonable application of Strickland, then we still must review the claim de novo to determine whether Breakiron is entitled to relief. See Bronshtein v. Horn, 404 F.3d 700, 724 (3d Cir. 2005).

The Pennsylvania Supreme Court's prejudice analysis reads in relevant part:

> We find that even if this argument had merit and that trial counsel could have requested a theft and a robbery jury charge, Breakiron cannot establish that he was prejudiced.
>
> The charge of the trial court instructed the jury not to return a guilty verdict of robbery without first finding that a theft had occurred.  (N.T. at

24

1352-54)  Moreover, trial counsel argued to the jury during closing argument that there could be no robbery, but solely a theft because Breakiron took money only after Ms. Martin was dead. (N.T. at 1312, 1320-21)  The jury rejected this argument and convicted Breakiron of robbery. In Breakiron I, we held that the evidence supported this verdict because there was no question that Breakiron took the victim's purse and the bags of money from the bar.  Breakiron I, 524 Pa. at 296-97, 571 A.2d at 1042.  Had a theft instruction been given, it is not likely that the jury would have returned a verdict only on the theft charge.

Breakiron-2, 729 A.2d at 1095.  Thus, the Pennsylvania Supreme Court rejected this claim because (1) the trial court's instruction made it clear that Breakiron was not guilty of robbery based on a theft alone, so the jury necessarily rejected counsel's argument that Breakiron committed theft alone, and (2) the evidence of robbery was sufficient.[12]

Breakiron challenges both rationales, arguing that the first is an "unreasonable application" of Strickland and that the second is "contrary to" Strickland.  We agree on both counts.  First, the Pennsylvania Supreme Court reasoned that

---

[12] The Pennsylvania Supreme Court went on to find no prejudice at the penalty phase because the jury found another aggravating circumstance in addition to the robbery.  See id. That issue is no longer relevant given the District Court's invalidation of the murder conviction and death sentence.

the jury would have found Breakiron guilty of robbery even if a separate theft instruction had been given because the trial court's instruction made clear that theft alone was not enough to convict of robbery, and the jury thus necessarily rejected Breakiron's argument that he committed theft alone. This reasoning is a significant stretch of plausibility. The problem with this analysis is that it rests solely on the jury's duty "'as a theoretical matter'" to acquit if it does not find every element of a crime and does not acknowledge the "'substantial risk that the jury's practice will diverge from theory'" when it is not presented with the option of convicting of a lesser offense instead of acquitting outright. Beck, 447 U.S. at 634 (quoting Keeble, 412 U.S. at 212). The crux of Breakiron's claim of prejudice is that he was exposed to this "substantial risk," but the Pennsylvania Supreme Court did not acknowledge it.[13]

Second, the Pennsylvania Supreme Court also noted that the evidence of robbery was "sufficient" because Breakiron admitted taking money from the bar. Breakiron argues that it was contrary to Strickland to rely on the mere sufficiency of the evidence of robbery because the only relevant question is whether there was a "reasonable probability" that the jury would have convicted him only of

---

[13] Breakiron has not argued that the Pennsylvania Supreme Court's decision is contrary to or an unreasonable application of Beck and Keeble themselves, but the principles set forth in those decisions are relevant in evaluating the Pennsylvania Supreme Court's assessment of prejudice. Cf. Strickland, 466 U.S. at 695 ("The governing legal standard plays a crucial role in defining the question to be asked in assessing the prejudice from counsel's errors.").

theft instead. The District Court rejected this argument because (1) the Pennsylvania Supreme Court did not rely solely on the sufficiency of the evidence, and (2) it is proper to consider the weight of the evidence in assessing prejudice under Strickland. (Dist. Ct. Op. at 94-95.)

The District Court is right that the Pennsylvania Supreme Court did not solely rely on the sufficiency of the evidence, and thus did not apply a "sufficiency of the evidence" standard that is contrary to the "reasonable probability" standard set forth in Strickland. The Pennsylvania Supreme Court's partial reliance on the sufficiency of the evidence, however, is nevertheless problematic. It is of course true that courts must weigh the evidence in assessing prejudice. See Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (citing Strickland, 466 U.S. at 695). The Pennsylvania Supreme Court, however, merely noted the sufficiency of the evidence without examining its weight. It did not weigh all the evidence of record (including Breakiron's testimony that he took the bags of money only after spotting them after the assault was over) to determine whether there was a reasonable probability that the jury would have convicted him only of theft if it had been given that option. Merely noting that the evidence was sufficient to convict does not accomplish that task. In sum, the Pennsylvania Supreme Court did not acknowledge the substantial risk to which Breakiron was exposed in the absence of a theft instruction and did not weigh the evidence of record to determine whether it prejudiced him. Thus, its ruling is both contrary to and an unreasonable application of Strickland.

The question remains whether Breakiron suffered

27

prejudice when the issue is considered de novo. Breakiron argues that the failure to request a theft instruction deprived the jury of the only way to give effect to counsel's theory of defense (i.e., that Breakiron committed a theft but not a robbery). The District Court reasoned that it would deny this claim even considered de novo essentially for the same reason as the Pennsylvania Supreme Court: the trial court properly instructed the jury on the elements of robbery, so the jury must have found those elements and not merely a theft in finding Breakiron guilty. (Dist. Ct. Op. at 95-96.) Thus, under the District Court's reasoning, counsel's failure to obtain a theft instruction did not deprive the jury of a way of giving effect to counsel's argument because the jury could have done so simply by finding Breakiron not guilty of robbery.

Like the Pennsylvania Supreme Court, however, the District Court did not account for the substantial risk that a jury will convict of an unproven offense when the defendant is guilty of some crime but the jury instructions present it with an all-or-nothing choice. See Beck, 447 U.S. at 634. The question in assessing prejudice is whether there is a reasonable probability that the jury did so here, and we conclude that there is. Breakiron testified that he did not decide to take the money bags until after his assault on Martin was complete and he left and then returned to the bar. The only evidence to the contrary was the mere fact that he took the money and Price's testimony suggesting that the incident as a whole was premeditated and that Breakiron took the money before his assault on Martin was complete. Thus, although Price's testimony supported the robbery charge for Brady purposes and the evidence was sufficient to convict, the prosecution's evidence on that charge was not particularly

28

strong and was far from overwhelming. Moreover, the robbery instruction actually given by the trial court, though initially proper, compounded the error by closing with the erroneous suggestion that the jury could convict Breakiron of robbery on the basis of a theft alone. Under the circumstances, there is a reasonable probability that the jury would have convicted Breakiron only of theft if the jury instructions had given it that option.[14]

### C. Counsel's Failure to Take Corrective Action at Voir Dire

Finally, Breakiron argues that his counsel rendered ineffective assistance in failing to take corrective action after a venire member testified that Breakiron "used to do a lot of robbing." During voir dire, a venire member (Charles Gerba, No. 67) testified under oath in front of the panel that he knew Breakiron and that Breakiron had committed robberies: "I know the boy. I lived in the terrace and he used to do a lot of robbing there." (N.T. 448; A.717.) Gerba also testified that, based on what he knew, he had a "fixed opinion" about the case and could not be an impartial juror, and the trial court excused him. (Id.) Breakiron's counsel did not object to Gerba's testimony or move to strike the venire panel or for a

---

[14] Breakiron also argues that he was prejudiced by the absence of a theft instruction because the robbery charge did not include a so-called "afterthought" instruction—i.e., an instruction emphasizing that he could not be guilty of robbery if he committed theft only as an "afterthought" following the murder. In his reply brief, Breakiron clarifies that this argument is not an independent claim for relief, so we need not address it. (Breakiron Reply Br. at 19-20.)

29

mistrial, and the trial court took no corrective action sua sponte. One of the venire members on the same panel who was in the room at the time (Paul Manges, No. 114) ended up serving on Breakiron's jury.

The trial court opened voir dire by questioning the venire members regarding their general knowledge of the parties and the case. Before reaching Gerba, the trial court conducted its initial questioning of Manges. The trial court asked him whether he had formed any opinion about the case from what he had read in the newspaper. Manges testified that he had not and agreed that he could decide the case "solely on the basis of what transpires in this room[.]" (N.T. 444-45; A.713-714.) The trial court later questioned Gerba, who testified that Breakiron "used to do a lot of robbing." After the trial court excused Gerba, counsel questioned the venire members left on the panel, including Manges, but neither counsel nor the trial court asked Manges about Gerba's statement. (N.T. 512-20; A.781-89.)

Breakiron argues that his counsel rendered ineffective assistance by failing to move to strike the venire panel, seek a mistrial, or take other corrective action to insure that no one exposed to Gerba's statement served on the jury. Breakiron raised this claim during his first PCRA proceeding. The PCRA court held an evidentiary hearing, at which his counsel testified. It then denied the claim on the merits, and the Pennsylvania Supreme Court affirmed. See Breakiron-2, 729 A.2d at 1093-94. The Pennsylvania Supreme Court based its ruling solely on the issue of counsel's performance. The District Court deferred to that ruling under AEDPA, but also explained that it would deny the claim on de novo review of the issue of prejudice as well.

30

### 1. Counsel's Performance

As the Supreme Court recently emphasized, the standard for evaluating counsel's performance under Strickland "is a most deferential one" that, under AEDPA, becomes "'doubly'" deferential when a state court already has found counsel's performance constitutionally sufficient. Harrington, 2011 WL 148587, at \*13 (quoting Knowles v. Mirzayance, 129 S. Ct. 1411, 1420 (2009)). Thus, we may not grant relief on this claim unless we conclude, not only that counsel's performance was objectively unreasonable, but that "there is no possibility fairminded jurists could disagree[.]" Id. at \*12. Even under this doubly deferential standard, we conclude that counsel's failure to take corrective action was objectively unreasonable and that the Pennsylvania Supreme Court unreasonably applied Strickland in concluding otherwise.

The Pennsylvania Supreme Court concluded that counsel's decision not to move to strike the venire panel or for a mistrial was part of a reasonable trial strategy. Its reasoning reads in full:

> Under these circumstances, a motion to strike the jury panel may have been an appropriate course of action. Nonetheless, trial counsel is not ineffective for failing to do so. At the PCRA hearing, trial counsel testified that he did not make a motion to strike or move for a mistrial because the seated juror had stated that he could render an unbiased opinion, and consequently there was no basis to strike the

31

panel or move for a mistrial. The PCRA court found that this was a plausible trial tactic, and therefore Breakiron failed to meet his burden that counsel's actions were not reasonably based.

> After reviewing the jury voir dire of the juror in question, we agree with the PCRA court, and find that trial counsel had a reasonable basis for his actions. The juror stated that he could be a fair and unbiased juror, and that no one spoke of the case in his presence. The PCRA court did not err in denying Breakiron's petition.

Breakiron-2, 729 A.2d at 1094 (citations and footnotes omitted). Thus, the Pennsylvania Supreme Court concluded that counsel's belief that Manges could be fair and impartial was a strategic reason for allowing him on the jury and that counsel's belief was reasonably supported by the record. Breakiron argues that this ruling was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), because the Pennsylvania Supreme Court misread the PCRA and voir dire transcripts. He also argues that its ruling was an unreasonable application of Strickland.

We agree that the Pennsylvania Supreme Court's characterization of the record is not entirely accurate. It based its ruling on two factual determinations. First, it concluded that counsel testified at the PCRA hearing that the reason he did not take corrective action was that "the seated juror had stated that he could render an unbiased opinion."

32

Breakiron-2, 729 A.2d at 1094. Counsel did not actually testify that he took no corrective action because Manges "stated that he could render an unbiased opinion." Counsel's actual testimony, in relevant part, was:

> A. Why didn't I ask for a mistrial at that point?
>
> Q. Yes, sir.
>
> A. Well, he was — that juror [apparently Gerba] was excused and —
>
> * * * * *
>
> A. I don't know why there was no request for a mistrial at that time, other than the fact that this guy [apparently Gerba] was excused, and I believe that we questioned all of the jurors individually after that. The court had asked several questions based on what Mr. Manges said, number 114, after consultation with Mr. Breakiron, we felt that he would be a fair and impartial juror toward Mr. Breakiron.

(N.T. PCRA 7/17/97 P.M. at 75-76; A.1897-98.) Thus, counsel testified merely that he "felt" Manges would be a fair and impartial juror, not that Manges actually said he could or that he declined to take corrective action on that basis.

Second, the Pennsylvania Supreme Court concluded that Manges's testimony at voir dire made counsel's decision

33

reasonable because its own review of the voir dire transcript confirmed that "[t]he juror stated that he could be a fair and unbiased juror[.]" Breakiron-2, 729 A.2d at 1094. Manges actually never testified that he could be a "fair and impartial juror," either in the abstract or in light of Gerba's statement. Under initial questioning by the trial court, Manges testified merely that he had not formed a fixed opinion from what he read in the newspapers and agreed that he could judge the case "solely on the basis of what transpires in this room[.]" (N.T. 444-45; A.713-14.) That questioning referred only to Manges's exposure to newspaper articles, and it occurred before Gerba made the statement at issue here (which, of course, "transpire[d] in th[at] room"). Manges also did not state that he could be a "fair and impartial juror" in response to counsel's questioning after Gerba testified. Manges did testify that he had not formed an opinion as to Breakiron's guilt or innocence, but only when asked whether he had done so on the specific bases of reading the newspaper or discussing the case with his wife. (N.T. 512-13; A.781-82.) And again, neither counsel nor the trial court asked him about Gerba's statement.

Even if we assume that the Pennsylvania Supreme Court's factual findings are entitled to deference under AEDPA, however, we still conclude that its ultimate ruling is objectively unreasonable. The Pennsylvania Supreme Court concluded that counsel's decision to allow Manges on the jury was a reasonable strategic decision because counsel believed that Manges could be fair and impartial. The primary problem with that conclusion is that counsel could have had no reasonable basis for that belief because neither he nor the trial court questioned Manges about Gerba's statement. Counsel's "feeling" that Manges could be fair and

34

impartial despite that statement thus was insufficiently informed. Cf. Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary.").

In addition, counsel's testimony does not explain why he took no action when Gerba made the statement in the first place. His initial testimony on that point was "I don't know why there was no request for a mistrial at that time[.]" (N.T. PCRA 7/17/97 P.M. at 75; A.1897.) Manges's answers to the trial court's questioning provided no basis not to do so because the trial court questioned Manges before Gerba made his statement.

Counsel later testified that he did not move for a mistrial because he did not think "that anything egregious had occurred" during jury selection. (N.T. PCRA 7/18/97 A.M. at 36; A.2021). That statement could mean that counsel did not believe anything "egregious" had occurred in light of his and the trial court's questioning of Manges, in which case it suffers from the same deficiencies just discussed. That statement could also mean that counsel did not believe that the panel's exposure to Gerba's testimony itself was sufficiently "egregious" to warrant corrective action. Either way, there is no reasonable basis to conclude that counsel's performance in this regard was constitutionally adequate.

Manges was exposed to sworn testimony that Breakiron "used to do a lot of robbing"—i.e., that Breakiron had a history of committing the very same crime of which he was accused at trial. Federal courts have long recognized that evidence suggesting a propensity to commit crimes is patently prejudicial. See, e.g., Old Chief v. United States, 519 U.S.

35

172, 181 (1997) (explaining that propensity evidence "'is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge'") (quoting Michelson v. United States, 335 U.S. 469, 476 (1948)); Albrecht v. Horn, 485 F.3d 103, 127 (3d Cir. 2007) ("Evidence that a defendant has committed prior criminal acts is highly prejudicial.").  As we have explained, when evidence suggesting "a propensity or disposition to commit crime . . . reaches the attention of the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.  A drop of ink cannot be removed from a glass of milk."  Government of the Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir. 1976).

Such evidence is all the more prejudicial where, as here, it reveals that the defendant previously committed the very kind of crime of which he or she stands accused.  See Old Chief, 519 U.S. at 185 ("Where a prior conviction was for a . . . crime . . . similar to the other charges in a pending case, the risk of unfair prejudice would be especially obvious[.]"); United States v. Bagley, 772 F.2d 482, 488 (9th Cir. 1985) ("To allow evidence of a prior conviction of the very crime for which a defendant is on trial may be devastating in its potential impact on a jury. . . .  [W]here, as here, the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again.").

The Pennsylvania courts have long recognized the

prejudicial nature of propensity evidence as well.  See, e.g., Commonwealth v. Harkins, 328 A.2d 156, 157-58 (Pa. 1974) ("When the jury learns that the person being tried has previously committed another crime, the prejudicial impact cannot be considered insignificant. 'The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence.'") (citation omitted).   The situation in Harkins was similar to that presented here.  In Harkins, a potential juror testified during voir dire that the defendant had stolen his car, and the defendant's counsel moved to strike the venire panel.  The trial court denied the motion and, though it excused that venire member, other members of the same panel went on to serve on the defendant's jury, which ultimately convicted him.   The Pennsylvania Supreme Court reversed the conviction and remanded for a new trial, explaining that "'[t]he fact that a reasonable inference of a prior criminal record is present in the minds of the jurors in and of itself mandates a new trial.'" Id. at 158 (quoting Commonwealth v. Allen, 292 A.2d 373, 376 (Pa. 1972)).  Thus, as Breakiron argues, it would have been obvious to any reasonably competent counsel that corrective action was both available under Pennsylvania law and essential to preserve Breakiron's presumption of innocence.[15]

Counsel, however, took no such action.  He declined to

_____

[15] The Pennsylvania Supreme Court appears to have assumed that counsel would have received corrective action if he had requested it, see Breakiron-2, 729 A.2d at 1094 (citing Harkins), and the Commonwealth has not argued otherwise.

do so, he testified, because he "felt" that Manges could be fair and impartial and did not believe that anything "egregious" had occurred. But avoidance of "egregiousness" is not the standard for constitutionally adequate performance; the standard is one of objectively reasonable performance under the circumstances. No objectively reasonable counsel would fail to recognize the patently prejudicial nature of testimony that Breakiron "used to do a lot of robbing" (which certainly qualifies as "egregious" in any event), and counsel provided no legitimate explanation for failing to take corrective action following that testimony. The Pennsylvania Supreme Court nevertheless accepted counsel's explanation at face-value without recognizing that it was insufficiently informed and without acknowledging the patently prejudicial nature of Gerba's testimony. For these reasons, we conclude both that counsel's performance was deficient under Strickland and that the Pennsylvania Supreme Court's conclusion to the contrary was objectively unreasonable.[16]

## 2. Prejudice

The Pennsylvania Supreme Court did not reach the issue of prejudice, so the District Court reviewed it de novo and we will do the same. See Porter, 130 S. Ct. at 452. The District Court concluded that Breakiron had not shown prejudice because, after Gerba made the statement at issue, Manges testified that he had not formed any opinion

---

[16] Although Breakiron's claim in this regard is one of ineffective assistance of counsel, we are surprised and troubled that the state trial court took no steps to address this patently prejudicial exposure sua sponte.

regarding Breakiron's guilt and that he understood that Breakiron was presumed innocent unless proven guilty beyond a reasonable doubt. (Dist. Ct. Op. at 35.) The District Court further reasoned that nothing in these responses led counsel or the trial court to question Manges's impartiality. (Id.) Thus, the District Court concluded that "Breakiron has failed to show that Juror 114 [Manges] was anything but a fair and impartial juror or that his presence on the jury prejudiced him." (Id.)

Although the parties have not squarely addressed it, this claim raises the threshold issue of how prejudice should be assessed in this context. The District Court appeared to require some indication that Gerba's statement actually rendered Manges biased or partial as a subjective matter, and the Commonwealth too argues that Breakiron failed to "establish" that Manges was anything other than fair and impartial. Thus, the District Court's reasoning and the Commonwealth's argument assume that a subjective approach to prejudice is appropriate in this case. Breakiron, by contrast, focuses on the prejudicial nature of the statement in question and assumes that its probable effect should be determined objectively. See Hummel v. Rosenmeyer, 564 F.3d 290, 303 (3d Cir. 2009) ("It is not necessary that the defendant show that the deficient conduct 'more likely than not altered the outcome in the case,'" but only that there is a "'reasonable probability'" that it did.) (quoting Strickland, 466 U.S. at 693, and adding emphasis). We agree that Strickland requires an objective inquiry here.

The parties have not cited, and we have not located, any authority squarely addressing the standard for prejudice when counsel is alleged to have rendered ineffective

39

assistance in connection with statements made during voir dire that potentially rendered one or more actual jurors biased or partial. Claims of juror bias or partiality themselves generally require a showing of actual or legally implied bias. See, e.g., Smith v. Phillips, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). Some courts have required petitioners to show actual or legally implied juror bias in similar contexts in order to satisfy the Strickland standard as well. See, e.g., Sanders v. Norris, 529 F.3d 787, 790-94 (8th Cir. 2008) (no prejudice from counsel's likely deficient voir dire questioning where no actual or legally implied juror bias); Fields v. Brown, 503 F.3d 755, 775-76 (9th Cir. 2007) (citing Strickland standard but holding that defendant was not prejudiced by counsel's deficient questioning during voir dire where habeas evidentiary hearing revealed that juror was not actually biased). The District Court and the Commonwealth both assume without explanation that this subjective approach is the proper one in this case.

Evidence of a juror's subjective bias or lack thereof may well be relevant in some cases involving allegations of ineffective assistance at voir dire. The narrow question presented here, however, is the standard for assessing prejudice when a panel member who ultimately serves on the jury is exposed to sworn testimony that the defendant previously committed crimes. Applying a subjective rather than an objective standard of prejudice in this context would conflict with Strickland. The proper inquiry under Strickland is not whether Gerba's statement actually rendered Manges biased or partial, but whether there is a reasonable probability

40

that a juror who had not been exposed to that statement would have voted to acquit Breakiron of robbery. See Saranchak v. Beard, 616 F.3d 292, 309 (3d Cir. 2010) (holding that state court improperly considered likely effect of evidence on the "particular [trial] judge . . . rather than considering, more abstractly, the effect the same evidence would have had on an unspecified, objective fact-finder, as required by Strickland") (citing Strickland, 466 U.S. at 695). Indeed, "evidence about the actual process of decision, if not part of the record of the proceeding under review, . . . should not be considered in the prejudice determination." Strickland, 466 U.S. at 695. Thus, Breakiron was not required to show that Manges was actually influenced by Gerba's statement, but had only to show a reasonable probability that any given juror would have been.[17]

Although we have not applied Strickland in this precise context, determining the objectively probable effect of prior-crimes evidence is hardly a novel task. We have

---

[17] The District Court reasoned that Breakiron could not show prejudice because Manges's voir dire testimony suggested that he could decide the case fairly. If counsel or the trial court had questioned Manges about Gerba's statement, and if Manges had testified that he could and would disregard it, then the District Court's reasoning might have more force (though we do not so hold). But neither counsel nor the trial court questioned Manges about Gerba's statement, so there is no record evidence bearing on whether Manges was actually influenced by that statement. Under the circumstances, Strickland requires that we assess its reasonably probable effect.

applied <u>Strickland</u>'s "reasonable probability" standard in assessing the effect of counsel's failure to object at trial to testimony revealing that the defendant had a criminal record, <u>see</u> <u>Carpenter v. Vaughn</u>, 296 F.3d 138, 150-51 (3d Cir. 2002), counsel's failure to object to evidence concerning a defendant's prior crimes, <u>see</u> <u>Buehl</u>, 166 F.3d at 175-76, and counsel's failure to request a limiting instruction regarding evidence of a defendant's prior crimes, <u>see</u> <u>Albrecht</u>, 485 F.3d at 128-29. We also have applied an objective standard in assessing the effect of references to a defendant's prior crimes in a variety of other contexts. <u>See, e.g.</u>, <u>United States v. Morena</u>, 547 F.3d 191, 194-97 (3d Cir. 2008) (prosecutor's reference to defendant's uncharged criminal activity); <u>Toto</u>, 529 F.2d at 283 (evidence of prior crimes).[18] The case before us thus calls for nothing more than a straightforward application of <u>Strickland</u>'s "reasonable probability" standard.

---

[18] In <u>Toto</u>, the trial court improperly admitted evidence of prior criminal acts. In assessing whether the error was harmful, we asked "'whether the error itself had substantial influence (on the minds of the jury.) If so, or if one is left in grave doubt, the conviction cannot stand.'" <u>Toto</u>, 529 F.2d at 283 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 765 (1946)). We further noted that this test required us to "resort to probabilities" and determine its probable effect in light of the other evidence presented. <u>Id.</u> The Supreme Court later adopted the <u>Kotteakos</u> standard we applied in this context as the standard for determining harmless error on collateral review, <u>see</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), and, as we have noted, "<u>Strickland</u> prejudice and <u>Brecht</u> harmless error are essentially the same standard[.]" <u>Albrecht</u>, 485 F.3d at 139 (citing <u>Whitney v. Horn</u>, 280 F.3d 240, 258-59 & n.18 (3d Cir. 2002)).

Having clarified the proper standard, we have no difficulty in concluding that it is satisfied in this case. As explained above, the prosecution's case on the robbery charge, though sufficient, was far from overwhelming. There was little evidence of record to rebut Breakiron's testimony and argument that he decided to commit theft only after the assault was complete and thus was not guilty of robbery. One of his jurors, however, had been exposed to sworn testimony that Breakiron "used to do a lot of robbing." As explained above, such propensity evidence is patently prejudicial. Indeed, exposure to such testimony may be so prejudicial that it cannot be cured even by a proper limiting instruction, which was neither requested nor given here. See Morena, 547 U.S. at 196-97; Toto, 529 F.2d at 283. Given the dearth of evidence on the robbery charge and the patently prejudicial nature of Gerba's sworn testimony that Breakiron "used to do a lot of robbing," there is a reasonable probability that corrective action by counsel would have produced a different result. Cf. Albrecht, 485 F.3d at 128-29 (although issue was "a very close one," defendant was not prejudiced by counsel's failure to request a limiting instruction regarding evidence of prior crimes because there was "ample" evidence of his guilt).

## III.    Conclusion

Although our review and opinion, as they must, focus on the procedural aspects of Breakiron's trial, three essential factors remain central and cannot be marginalized: a woman named Saundra Marie Martin is dead; money was stolen from the owner of "Shenanigan's"; and Mark Breakiron must respond for the horrible sequence of events that occurred there. The procedural pathway to the final disposition for

43

Breakiron, however, must follow strict guidelines. Accordingly, we will reverse the District Court's judgment to the extent that it denied Breakiron's habeas petition as to his robbery conviction and remand with an instruction to grant his petition as to that conviction for the reasons explained in this opinion.